MARGARET A. MORAN,               )
                                 )
          Plaintiff              )
                                 )
     v.                          )  CIVIL NO. 2:12 cv 28
                                 )
MICHAEL J. ASTRUE, Commissioner, )
Social Security Administration,  )
                                 )
          Defendant              )

## OPINION AND ORDER

This matter is before the court on the petition for judicial review of the decision of the Commissioner of Social Security filed by the claimant, Margaret A. Moran, on January 18, 2012. For the reasons set forth below, the decision of the Commissioner is **REMANDED.**

## Background

The claimant, Margaret A. Moran, applied for Widow's Disability Insurance Benefits, alleging a disability onset date of March 12, 2008. (Tr. 126-27) Her claim initially was denied on July 17, 2008, and again denied upon reconsideration on September 2, 2010. (Tr. 34-35) Moran requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 39) A hearing before ALJ Michael Hellman was held on September 2, 2010, at which Moran, her son, Scott Moran, and vocational expert Leonard Fisher, Ph.D. testified. (Tr. 11-32)

On December 7, 2009, the ALJ issued his decision denying benefits. (Tr. 36-53) The ALJ found that Moran was not under a disability within the meaning of the Social Security Act. (Tr. 36-53) Following a denial of Moran's request for review by the Appeals Council, she filed her complaint with this court.

Moran was born on November 23, 1955, and was 52 years of age at the time of her alleged disability onset. (Tr. 126) She stands 5'4", weighs 170 pounds, and possesses a high school diploma and certificate from secretarial school. (Tr. 13, 135) Moran has no past relevant work. (Tr. 12)

In 1990, Moran suffered a severe Cerebrovascular Accident, or stroke, in the left front and parietal lobes. (Tr. 13, 276) As a result, Moran lost her ability to walk and speak. Moran underwent rehabilitative therapy and learned how to walk again and regained her speech, but the stroke had long-lasting effects. (Tr. 13, 276) Before her stroke, Moran was right hand dominant, but as a result of the stroke, she suffered right-side paralysis and has become dependent on her left hand. (Tr. 14, 19) Moran has developed tendinitis on her left side. (Tr. 286-288, 291-92) She also complains that her stroke caused memory loss, forgetful-ness, right-sided weakness and paralysis, and difficultly writing and walking. (Tr. 13, 20, 23-35, 147, 229, 276, 309)

A computer tomography scan in 2003 displayed a large infarct in the left frontal and parietal lobe, which was evidence of the stroke she suffered 13 years earlier. (Tr. 276) The CT scan also revealed that Moran's brain had atrophied in several areas of the right and left frontal and parietal lobes. (Tr. 276)

Moran adapted her gait to her right-sided weakness. As a result of putting more pressure on her left side, she experienced a stress fracture in her left foot. (Tr. 309) She was prescribed a bone stimulator to encourage new bone growth because her fracture was slow to heal. (Tr. 299) Her adapted gait made her more susceptible to falls and fractures. (Tr. 213, 228, 279, 309, 315, 354)

Most of Moran's medical records following her stroke were destroyed by natural disaster or the passage of time. (Tr. 26, 335) The remaining available medical evidence shows that she suffered depression after the stroke in addition to a period of psychosis. (Tr. 308-09, 329) Over the last few years, her physicians have recorded evidence of a hearing loss. (Tr. 344, 358)

After Moran filed her petition for benefits, she was interviewed by an employee of the Social Security Administration. The interviewer described Moran as slow in understanding, answering, and remembering details. (Tr. 128) He described her right hand

as "crumpled" and noted that she had difficulty signing the medical release. (Tr. 128) He also noted that she was slow to rise and lower from her seat. (Tr. 128)

Following her interview, Moran underwent a physical examination by Dr. M. Siddiqui, M.D. She reported her stroke and complained of slurred speech and difficulty gripping with her right hand, but she acknowledged improvement in her speech since beginning therapy. (Tr. 228) Dr. Siddiqui's examination revealed symmetric extremities, mild stiffness with slight decreased range of motion of the right shoulder, non-tender bilateral extremity joints, no joint effusion, and mostly normal muscle and grip strength. (Tr. 229) She had difficulty squatting, walking on her heels and toes, and picking up and gripping a coin with her right hand. (Tr. 229) Her range of motion in her right shoulder was reduced by as much as 50 degrees from the standard. (Tr. 231) Her speech was slightly slurred, but Dr. Siddiqui noted that he could understand her conversation. (Tr. 229) Dr. Siddiqui did not give an opinion as to Moran's disabled status.

Dr. Gary Durak conducted a psychological evaluation on Moran. He found that Moran was oriented in all spheres, cooperative, and able to interact. (Tr. 242) She exhibited appropriate appearance and normal motor activity, but she had problems sitting, walking, standing, climbing stairs, and bending, and

when using her right side, with lifting, reaching, grabbing, and holding. Her speech reflected an expressive language disorder and a communication disorder with delayed responses. (Tr. 242) She was alert, but her concentration was "distractible" and her memory was impaired. Moran's thought processes and thought content both were within normal limits. He found that her affect and mood indicated depression. (Tr. 242) Dr. Durak administered the Wechsler Memory Scale-III and found that Moran was in the extremely low range in the areas of auditory immediate memory (1st percentile), visual immediate memory (1st percentile), and immediate memory (1st percentile). (Tr. 243) She was in the borderline range in auditory delayed memory (3rd percentile), visual delayed memory (3rd percentile), general memory (3rd percentile), and working memory (5th percentile). (Tr. 243-44) Dr. Durak assigned Moran a Global Assessment of Functioning (GAF) score of 45. (Tr. 244)

In July 2008, state agency reviewing doctor Kenneth Neville, Ph.D., completed a mental capacity assessment. (Tr. 248-251) He reviewed the reports from the independent consultative examiners and Moran's surviving medical records. Dr. Neville completed a checkbox form finding that Moran was moderately limited in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration

for extended periods, respond appropriately to changes in the work setting, and complete a normal work day and work week without interruptions from psychologically based symptoms. He also determined that Moran could perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 248-49) Moran was able to understand, remember, and carry out simple instructions, make simple work-related decisions, remember locations and simple work-like procedures, maintain an ordinary routine without special supervision, relate to others, attend to tasks for extended periods with normal pace, manage day-to-day stress, adapt to workplace changes, and maintain a schedule. (Tr. 250) Dr. Neville determined that the consulting physicians were mistaken in their observations of Moran's abilities and had exaggerated their findings.

State agency reviewing physician Dr. F. Lavallo, M.D., also completed a physical capacity assessment. (Tr. 266-273) He determined that Moran could lift, carry, push, or pull up to 20 pounds occasionally and ten pounds frequently, stand, walk or sit for six of eight hours a day, occasionally perform postural activities, and occasionally reach and finger with the right hand. (Tr. 267-269) Moran occasionally could climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (Tr. 268) Dr. Lavallo noted that Moran had a limited range of motion in her

right shoulder and difficulty in gripping with her right hand. (Tr. 267) He also noted that Moran was limited in her ability to reach in all directions, including overhead, and fingering or fine manipulations. (Tr. 269)

Moran's treating physician, Dr. Ramaraj Yalavarthi, prepared a letter dated September 13, 2011, stating that Moran had several falls resulting in fractures, suffered from involuntary movements of her left hand, right sided paralysis, and speech impairment secondary to her stroke. (Tr. 369) Dr. Yalavarthi stated that these conditions prevent Moran from engaging in any gainful employment. (Tr. 369)

At the hearing before the ALJ, Moran testified that she lived alone with her dog. (Tr. 11-12, 15) She had a high school diploma and had not worked in over 25 years, although she tried to obtain work after her stroke. (Tr. 12-13) She continued to experience weakness and paralysis on her right side from her stroke, and she had no control over her right hand, stating that she used it only to carry her handbag on her wrist. (Tr. 19, 22) She had difficulty with her memory, explaining that it had become worse in the last few years, and she struggled to find the right words to express herself. (Tr. 20-21) She got tired frequently and had to take naps or rest on benches when out in public. (Tr. 21) Moran's typical day involved getting up, letting her dog

outside, and making coffee.  (Tr. 14-15) She then made her bed, bathed, and straightened her house, vacuuming if needed.  (Tr. 15) She spent most of her day watching television and took short naps. (Tr. 16, 21) She occasionally drove to the store.  (Tr. 16) Her sons often visited her and took her out to eat.  (Tr. 16-17) She no longer could bowl, sew, or engage in hobbies.  (Tr. 15-16)

Moran's son, Scott Moran, was next to testify.  He stated that Moran was regressing, her right leg was getting weaker, and he worried about her driving.  (Tr. 23, 25) She could not open jars or lift objects easily because of her right side paralysis. (Tr. 23, 25) She struggled to speak and her conversations were peppered with frequent silence because she struggles to find the words to use.  (Tr. 23) Moran was hospitalized a few years before the hearing with progressive dementia and her memory now was so poor that her sons started administering her finances and came by her house frequently to assist with chores, although Moran continued to care for her dog.  (Tr. 24) She recently had started exhibiting involuntary movements, even slapping herself, but her finances prevented any treatment.  (Tr. 25-26)

Vocational Expert Dr. Leonard Fisher, Ph.D., was last to testify.  The ALJ asked the VE to name any appropriate jobs for an individual of Moran's age, education, and work experience, who was limited to light work and occasional climbing of ladders,

ropes, scaffolds, ramps, and stairs, balancing, stooping, crouching, kneeling, and crawling. The hypothetical individual also was limited to occasional reaching overhead with the right arm and occasional fingering using the right hand and could perform only simple, routine, and repetitive tasks. (Tr. 27) The VE replied that employment existed for such an individual as an usher (2,200 positions), parking lot attendant (5,200 positions), and school bus monitor (900 positions). In response to a query from the ALJ, the VE stated that the named positions still would be available even if the employee could not engage in complex or frequent verbal communication. (Tr. 28)

The ALJ asked the VE whether his testimony was consistent with the Dictionary of Occupational Titles (DOT). (Tr. 28) The VE responded affirmatively, but he explained that the DOT does not discuss limitations in the use of the right upper extremity. He based his response concerning the use of the arm on his experience. (Tr. 28-29)

In his decision, the ALJ discussed the five-step sequential evaluation process for determining whether an individual was disabled. (Tr. 40-50) In step one, the ALJ found that Moran had not engaged in substantial gainful activity since March 12, 2008, her alleged onset date. (Tr. 41) At step two, the ALJ found that Moran had the following severe impairments: residual complica-

tions from stroke, adjustment disorder, and cognitive disorder. (Tr. 41)

At step three, the ALJ found that Moran's impairments did not meet or medically equal one of the listed impairments. (Tr. 42) In particular, the ALJ determined that the residuals of Moran's stroke did not satisfy Listing 11.04 because there was no evidence to show that she had sensory or motor aphasia resulting in ineffective speech or communication, significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station. (Tr. 42)

The ALJ also determined that Moran's impairments did not meet or equal the criteria of Listings 12.02 or 12.04. (Tr. 42) The ALJ explained that Moran's impairments did not satisfy the Paragraph B criteria, which required a finding of at least two of the following: a marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. (Tr. 42) The ALJ determined that Moran had a mild restriction in activities of daily living because she engaged in such activities as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring for

her hygiene, using telephones, and using a post office.  (Tr. 42)
Moran could drive a car, go to the grocery store, and do simple
cooking and cleaning.  Her typical day involved getting up at 8
or 9 A.M., making coffee, letting the dog out, making the bed,
taking a shower, vacuuming, doing laundry, and straightening up.
(Tr. 42)

The ALJ also found that Moran had mild limitations in social
functioning because she was able to interact independently,
appropriately, effectively, and on a sustained basis with others.
Moran reported that she got along well with those she interacted
with.  (Tr. 43) The ALJ next explained that Moran had moderate
difficulties with concentration, persistence, and pace.  Moran
had the ability to sustain focused attention and concentration
long enough to complete tasks.  She was able to remember to let
out, feed, and give water to her dog.  (Tr. 43) At a mental
status examination, Moran was able to recall what she had for
breakfast and dinner and who brought her to the appointment.  She
also could recall four digits forward and three backwards.  (Tr.
43) On short-term memory, she could recall three of six items
after ten minutes of lapsed time, and on arithmetic calculation,
she successfully completed 17 out of 20 items in 60 seconds time.
She also completed serial subtractions in one minute and 30
seconds with two errors.  (Tr. 43) The ALJ also recognized that

Moran was in the extremely low range for auditory immediate memory, visual immediate memory, and immediate memory on the Wechsler Memory Scale III test and in the borderline range in the areas of auditory delayed memory, visual delayed memory, general memory, and working memory. (Tr. 43) The ALJ concluded by stating that the record did not reflect that Moran experienced repeated episodes of decompensation. Because she did not have at least two marked limitations or one marked limitation and an episode of decompensation, the ALJ found that Moran did not satisfy the Paragraph B criteria. (Tr. 43)

At step four, the ALJ found that Moran had the residual functional capacity to perform simple, routine, and repetitive light work, which he defined as: frequently lifting and/or carrying up to 10 pounds; occasionally lifting and/or carrying up to 20 pounds; standing/walking, each for about six hours in an eight hour workday; and sitting for at least six hours in an eight hour workday; occasional climbing of ropes, ladders, or scaffolds, ramps, and stairs; occasional balancing, stooping, crouching, kneeling, and crawling; occasional reaching and overhead reaching with the right upper extremity; occasional fingering with the right upper extremity; and occupations that did not require frequent verbal communication. (Tr. 44) In reaching this conclusion, the ALJ summarized Moran's medical

evidence.  (Tr. 45) Moran had right-sided weakness from her stroke but had learned to adjust and use her left hand.  Moran testified that she used her right hand only to hold her purse and that she had difficulty walking, sitting, standing, stair climbing, and bending.  Scott Moran corroborated Moran's complaints and alleged that she was getting worse, but the ALJ determined there was no objective medical evidence to support that.  (Tr. 45)

The ALJ next noted that the Disability Report and Reconsideration Disability Report did not list any difficulties observed by the Social Security Administration employees.  During Moran's interview at the field office, it was noted that the interviewer observed difficulty with understanding, coherency, concentrating, talking, answering, sitting, standing, walking, using her hands, and writing.  The ALJ also considered Moran's appearance, observing that she did not require the use of an assistive device for ambulating or brace on her right hand. (Tr. 45)

The ALJ concluded that Moran's allegations were not supported by the medical evidence.  (Tr. 46) The consultative examination noted deficits in right upper extremity muscle strength and right grip, as well as slurred speech and a slightly limping gait, but the examiner found her alert, oriented, ambulating without an assistive device, and in no acute distress.

The physician stated that he could understand her well and there were no expressions of any weakness.  (Tr. 46)

At the June 16, 2008 consultative examination, Moran's extremities were symmetric.  (Tr. 46) There was mild stiffness with slight decreased range of motion of the right shoulder. Moran's right-upper extremity was -4/+5, the right lower extremity was +4/+5, the left upper and lower left extremity was 5/5. Her right grip was weak -4/5 and the left was 5/5.  She had difficulty squatting and picking and gripping with her right hand.  At four examinations between 2008 and 2010, Moran stated that she had no joint or muscle complaints.  She also denied symptoms associated with tinnitus, vertigo, heightened sensitivity to noise, ear pain or hearing loss.  (Tr. 46) She had no loss of balance, no decrease in her ability to concentrate, no episodes of dizziness, gait difficulties, headaches, loss of consciousness, loss of sensation, memory loss, complaints of muscle weakness, seizures, speech difficulties, or complaints of tremor. From this, the ALJ concluded that there was no evidence to support Scott Moran's testimony that Moran had involuntary movements of her arms.  None of the treating or examining sources indicated that her impairments required that she take a nap.  (Tr. 46)

Moran testified that her memory had become worse, but there was no evidence of inpatient psychiatric hospitalization, sub-

stance abuse, or history of mental illness in her biological family. (Tr. 46) Moran testified that she was hospitalized for dementia, her brother took over her finances, and that her doctor told her that her symptoms would get worse because of the brain damage she suffered. (Tr. 47) The ALJ disagreed with this, stating that the allegations were not supported by the medical evidence. (Tr. 47) Dr. Durak found that Moran was oriented in all spheres, cooperative, and able to interact. Her speech reflected an expressive language disorder and a communication disorder and she gave delayed responses. Her memory was impaired, but her thought process and content were within normal limits. (Tr. 47) Moran was diagnosed with adjustment disorder, with depressed mood, cognitive disorder, and expressive language disorder. Dr. Durak assessed a GAF score of 45, indicating serious symptoms in one of the following: social, occupational, or school functioning. However, reviews of psychiatric systems performed on January 22, 2009, March 16, 2010, and March 24, 2010, essentially were normal. (Tr. 47)

The ALJ gave great weight to the state consultative physicians' opinions. Dr. Neville completed a Psychiatric Review Technique Form in which he determined that Moran had mild limitations in activities of daily living and social functioning, moderate limitations in concentration, persistence, or pace, and

no episodes of decompensation.  (Tr. 47)  Dr. Neville also
completed a Mental Residual Capacity Assessment Form in which he
stated that Moran was moderately limited in her ability to under-
stand and remember detailed instructions, carry out detailed
instructions, maintain attention and concentration for extended
periods, complete a normal work-day and work week without inter-
ruptions from psychologically based symptoms and to perform at a
consistent pace without an unreasonable number and length of rest
periods, and respond appropriately to changes in the work set-
ting.  (Tr. 48)  Dr. Neville concluded that Moran had the ability
to carry out simple, repetitive tasks on a competitive basis.
Dr. Larsen affirmed Dr. Neville's conclusion.  (Tr. 48)

Based on this evidence, the ALJ concluded that Moran experi-
enced some limitations and restrictions from her impairments, but
the medical record in its entirety demonstrated that she had no
greater limitations in her ability to perform work related
activities than those reflected in the RFC.  The evidence showed
that she had the intellectual capacity to make simple work-
related decisions, to remember locations, and to remember simple
work-like procedures.  (Tr. 48) She was able to maintain an
ordinary daily routine without supervision, and could cook,
clean, and shop.  (Tr. 49) The ALJ accounted for her speech by

limiting Moran to occupations that did not require frequent verbal communication.  (Tr. 49)

With the RFC determined, at step four the ALJ found that Moran did not have any past relevant work.  (Tr. 49)  After considering Moran's age, education, work experience, and RFC, the ALJ determined that there were significant jobs available in the national economy that she could perform, including usher (2,200 positions), parking lot attendant (5,200 positions), and school bus monitor (900 positions).

## Discussion

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence.  42 U.S.C. §405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 852 (1972)(*quoting Consolidated Edison Company v. NLRB*, 305 U.S.

17

197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)). *See also*

*Shideler v. Astrue,* 688 F.3d 306, 310 (7th Cir. 2012)*; Jens v.*

*Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Sims v. Barnhart*,

309 F.3d 424, 428 (7th Cir. 2002). An ALJ's decision must be

affirmed if the findings are supported by substantial evidence

and if there have been no errors of law. *Rice v. Barnhart*, 384

F.3d 363, 368-69 (7th Cir. 2004); *Scott v. Barnhart*, 297 F.3d

589, 593 (7th Cir. 2002). However, "the decision cannot stand if

it lacks evidentiary support or an adequate discussion of the

issues." *Lopez*, 336 F.3d at 539.

Disability insurance benefits are available only to those

individuals who can establish "disability" under the terms of the

Social Security Act. The claimant must show that she is unable

> to engage in any substantial gainful activity
> by reason of any medically determinable phys-
> ical or mental impairment which can be ex-
> pected to result in death or which has lasted
> or can be expected to last for a continuous
> period of not less than 12 months.

> 42 U.S.C. §423(d)(1)(A)

The Social Security regulations enumerate the five-step sequen-

tial evaluation to be followed when determining whether a claim-

ant has met the burden of establishing disability. 20 C.F.R.

§404.1520. The ALJ first considers whether the claimant is

presently employed or "engaged in substantial gainful activity."

20 C.F.R. §404.1520(b). If she is, the claimant is not disabled

and the evaluation process is over; if she is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities." 20 C.F.R. §404.1520(c). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. 20 C.F.R. §401, pt. 404, subpt. P, app. 1. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling.

However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" (RFC) and the physical and mental demands of her past work. If, at this fourth step, the claimant can perform her past relevant work, she will be found not disabled. 20 C.F.R. §404.1520(e). However, if the claimant shows that her impairment is so severe that she is unable to engage in her past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of her age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy. 42 U.S.C. §423(d)(2); 20 C.F.R. §404.1520(f).

Moran argues that the ALJ "cherry-picked" the evidence and disregarded a substantial amount of evidence that was favorable

to support a finding that she was disabled.  Specifically, Moran argues that the ALJ relied on her daily activities although they are not comparable to a work setting, the ALJ parsed through the medical evidence and ignored her GAF score, and the ALJ erroneously relied on the medical opinions of the consultative physicians who never examined her.

SSR 96-8p explains how an ALJ should assess a claimant's RFC at steps four and five of the sequential evaluation.  In a section entitled, "Narrative Discussion Requirements," SSR 96-8p specifically spells out what is needed in the ALJ's RFC analysis.  This section of the Ruling provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved. (footnote omitted)

> SSR 96-8p

Thus, as explained in this section of the Ruling, there is a difference between what the ALJ must contemplate and what he must

articulate in his written decision.  *See **Morphew v. Apfel***, 2000 WL 682661, *3 (S.D. Ind. 2002) ("There is a distinction here [in SSR 96-8p] between what the ALJ must consider and what the ALJ must articulate in the written opinion."); ***Lawson v. Apfel***, 2000 WL 683256, *2-4 (S.D. Ind. May 25, 2000) (ALJ who restricted the claimant to medium work satisfied the requirements of SSR 96-8p)("[SSR 96-8p] does not require an ALJ to discuss all of a claimant's abilities on a function-by-function basis. Rather, an ALJ must explain how the evidence supports his or her conclusions about the claimant's limitations and must discuss the claimant's ability to perform sustained work activities.").  The ALJ is required to "consider the aggregate effect of this entire con-stellation of ailments — including those impairments that in isolation are not severe." ***Golembiewski v. Barnhart***, 322 F.3d 912, 918 (7th Cir. 2003). The ALJ cannot ignore entire lines of evidence or cherry pick the evidence that is favorable to a finding of non-disability. ***Golembiewski***, 322 F.3d at 917. Rather, the ALJ must weigh all impairments and consider the effect these ailments have on the claimant's ability to function in their entirety.

The notes to SSR 96-8p explain that the "RFC is the individ-ual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis,

and the RFC assessment must include a discussion of the individ-
ual's abilities on that basis."  When making this determination,
the ALJ may consider the claimant's daily activities.  If the ALJ
places significant weight on a claimant's daily activities to
support a finding that the claimant can sustain employment, the
activities must reflect that the person is capable of engaging in
work eight hours a day for five consecutive days a week.  *Carra-
dine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004).  To show
this, the record should reflect that the claimant engages in such
activities for a substantial part of the day.  Evidence of
sporadic physical activity is not sufficient because a claimant
may engage in sporadic activities despite pain, but may not be
able to engage in continuous activity for an eight-hour workday.
Moreover, the activities must be transferable to a work setting.
The ALJ must make a clear record that the claimant's activities
are such that the claimant could perform duties common to the
work place on a sustained basis.  *Carradine,* 360 F.3d at 756.

        In *Carradine*, the claimant testified that she could drive,
shop, and do housework.  The ALJ relied on this when determining
that the claimant was capable of working.  *Carradine,* 360 F.3d at
756.  On appeal, the Seventh Circuit explained that although the
claimant could perform these activities, the claimant performed
the reported activities on a sporadic basis, and the record was

not clear whether these skills were related to a work setting or whether the claimant could sustain activity on a continuous basis during an eight-hour work day.  The Seventh Circuit remanded for further explanation of how the claimant's reported daily activities were consistent with a finding that she could engage in work eight hours a day, five days a week.  ***Carradine***, 360 F.3d at 756.

Moran argues that her daily activities do not support the ALJ's finding that she was capable of gainful employment. Specifically, she argues that her activities were not related to a work setting, her activities were performed on a sporadic basis and were necessary to survive, and the ALJ failed to consider how limited she was at performing these activities.  The Commissioner disputes Moran's position, arguing that the activities Moran performed were not necessary to survival, the ALJ considered her activities as a whole, and the ALJ acknowledged that Moran completed these activities at a slower than average pace.

The Commissioner has pointed to several cases in support of his argument.  In these cases, significant facts beyond the claimant's activities supported the ALJ's decision to disregard the claimant's testimony concerning her capabilities.  In one case, the record reflected that the claimant had a history of falsifying information.  ***Prochaska v. Barnhart***, 454 F.3d 731, 738 (7th Cir. 2006) (finding the claimant not credible because she

previously falsified information to obtain unemployment bene-
fits).  In another, the claimant testified that she was disabled,
yet the record reflected that she applied for jobs after the
alleged onset date.  *Castile v. Astrue*, 617 F.3d 923, 930 (7th
Cir. 2010).  And in the third, the claimant's testimony at the
hearing addressing her daily activities directly conflicted with
her account of daily activities as given at an earlier interview.
*Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).  In each
case, there was information to show that the claimant's testimony
likely was falsified or inconsistent with the daily activities
she reported at the hearing.  Here, that is not the case.

Moran testified about the activities she performed, which
included cooking, driving, completing household chores such as
making her bed, making coffee, bathing, letting her dog out,
visiting with family and friends, going out to eat, and attending
church services.  However, she informed the ALJ that it took her
significantly longer to perform the activities.  The activities
were performed in Moran's own home and at her own pace, and Moran
could structure her day around her physical limitations.  Al-
though Moran performed a variety of activities, there was no
indication that she did all of these activities every day or that
she was capable of performing them in a continuous manner.  The
Commissioner argues that the fact that she lived alone and had to

perform many of these activities to survive is irrelevant, however, the court disagrees. Many of the tasks she performed were essential to daily living and were tasks she might have done in spite of pain in order to survive.

The ALJ has not explained how Moran's daily activities would translate into completing tasks on a continuous basis during an eight-hour work day. The record reflects that Moran had significant difficulties with her memory. She was in the extremely low range in areas of auditory immediate memory, visual immediate memory, and immediate memory. It is not clear how remembering to let her dog out, completing household chores, and maintaining general hygiene demonstrated that she had the capabilities to remember assignments. The record also reflects that her capabilities were decreasing. Moran's son testified that he was taking over performing chores for her, he recently began maintaining her finances, and he was worried about her driving. The ALJ failed to explain not only how these activities suggest that Moran could engage in activity for a continuous period, but also how the activities she performed translated into skills required to maintain employment. Sporadic skills necessary for survival may not translate into skills useful during employment. This matter is REMANDED to the ALJ for further clarification on how Moran's activities were transferable to a work setting and how her

activities were consistent with a finding that she could engage in continuous activity for eight-hours a day, five days a week.

The parties next dispute whether the ALJ provided an adequate explanation for dismissing the GAF score Dr. Durak assigned. The GAF scale measures a "clinician's judgment of the individual's overall level of functioning." *Am. Psychiatric Ass'n, Diagnosis and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision, 32, 34 (2000) (DSM IV—TR). The established procedures require a mental health professional to assess an individual's current level of symptom severity and current level of functioning, and adopt the lower of the two scores as the final score. *Id.* at 32—33. A GAF score ranging from 41—50 indicates serious symptoms; scores ranging from 51—60 indicate moderate symptoms; and scores ranging from 61—70 indicate mild symptoms. *Id.* GAF scores are "useful for planning treatment" and are measures of both severity of symptoms and functional level. *Id.* At 32-34. Because the "final GAF rating always reflects the worse of the two," the score does not reflect the clinician's opinion of functional capacity. "[N]owhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." ***Wilkins v. Barnhart***, 69 Fed.Appx. 775, 780 (7th Cir. 2003) (*citing **Howard v. Comm'r of Soc. Sec.***, 276 F.3d 235,

241 (6th Cir. 2002)).  However, the GAF score may assist in formulating the claimant's RFC.  ***Adams v. Astrue***, 2009 WL 1404675, *4 (N.D. Ind. May 18, 2009).

The ALJ was not required to cite or discuss a claimant's GAF score in his opinion.  *See **Boone v. Astrue***, 2010 WL 2943637, *7 (N.D. Ind. July 22, 2010).  This is because the ALJ need not address every piece of evidence in his analysis.  However, this must be weighed against the ALJ's duty to provide some minimal explanation of his reasoning and to support his opinion with substantial evidence.  ***Boone***, 2010 WL 2943637 at *7.  It is not entirely clear that the ALJ satisfied that duty here.  In addition to dismissing the GAF score, the ALJ also decided to disregard Dr. Durak's opinion in its entirety.  In doing so, the ALJ stated that "reviews of psychiatric systems at the time of routine exams were essentially normal."  Two of the reviews the ALJ pointed to made no mention of concentration or memory, the two areas where Dr. Durak found that Moran struggled the most. Although the third report stated that Moran had no decreased ability to concentrate or memory loss, this did not equate to saying her memory was intact in all areas or that her concentration was at a level sustainable for employment.  It does not appear that the reviews in fact contradict Dr. Durak's opinion.

The ALJ went on to explain that he adopted the opinions of the non-examining consultative physicians over that of the consultative examining physicians, including Dr. Durak, and Moran's treating doctors. A treating source's opinion is entitled to controlling weight if the "opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. §404.1527(d)(2). *See also* SSR 96-2p (same); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)(same); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)(same). A physician who merely reviews a claimant's file without personal observation of the claimant deserves little weight in the evaluation of disability. *Anderson v. Heckler*, 602 F.Supp. 46, 50 (N.D. Ill. 1985) (*citing Whitney v. Schweiker*, 695 F.2d 784, 789 (7th Cir. 1982)). Inconsistencies in a treating physician's opinion, whether conflicting internally or with other substantial evidence in the record, may justify denying the opinion controlling weight. 20 C.F.R. §404.1527(c)(2); *Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000). *See, e.g., Schmidt,* 496 F.3d at 842 ("An ALJ thus may discount a treating physician's medical opinion if the opinion is inconsistent with the opinion of a consulting physician or when the treating physician's

opinion is internally inconsistent, as long as he minimally articulates his reasons for re-editing or rejecting evidence of disability."); *Latkowski v. Barnhart*, 93 Fed. Appx. 963, 969 (7th Cir. 2004)(same).  The ALJ also may disregard a treating physician's opinion if there is evidence that he was "leaning over backwards" to help the claimant receive benefits.  *Cummins v. Schweiker*, 670 F.2d 81, 84 (7th Cir. 1982).  However, "a consulting physician cannot supply substantial evidence just by contradicting reports about the underlying facts or offering unfounded speculation . . . when the consulting physician adds new information or perspectives, that may be substantial evidence."  *Russell v. Sullivan*, 1990 WL 610874, *8 (N.D. Ind. Jan. 23, 1990) (*citing Garrison v. Heckler*, 765 F.2d 713 (7th Cir. 1985)).

The ALJ based his opinion on the assessment reports of Dr. Lavallo and Dr. Neville.  Both physicians were non-examining consultative physicians.  They reviewed the medical records and provided their opinions of Moran's RFC.  In adopting their opinions, the ALJ rejected the opinion of Dr. Durak, the state agency mental health specialist who examined Moran on one occasion and reported his assessment of her RFC.  Because the ALJ was required to give greater weight to the opinions of physicians who examined the claimant, the court must consider whether Dr. Durak's opinion and the medical records from Moran's treating

physicians were not well-supported by medically acceptable clinical and laboratory diagnostic techniques or were inconsistent with the other substantial evidence, and whether the consultative physicians' conclusions were supported by substantial evidence and not based on speculation.

Dr. Durak examined Moran, rendering his opinion entitled to greater weight than that of Dr. Lavallo and Dr. Neville. Upon examination, Dr. Durak found that Moran had a language disorder and gave delayed responses. Her concentration and memory were impaired, and when Dr. Durak administered the Wechsler Memory Scale-III, Moran scored in the extremely low category. This was consistent with the observations of the interviewer at the Social Security Administration. He described Moran as slow in understanding, answering, and remembering details. (Tr. 128) The record was littered with notes that Moran experienced memory loss and forgetfulness. (Tr. 13, 20, 23-35, 147, 229, 276, 309) In light of the test that Dr. Durak administered and the numerous portions of the record referring to Moran's concentration and memory problems, it appears that Dr. Durak's opinion was supported by substantial evidence. Although the ALJ stated that later psychiatric reviews showed that Moran's condition was normal, as explained above, this was not an accurate depiction of what these reviews stated. There was no evidence that the test

he administered was not reliable or that his findings were inconsistent with other tests or observations. Moreover, because Dr. Durak was a state consultative examining physician, the risk that he would "bend over backwards" to help Moran obtain benefits was reduced.

The ALJ did not point to one piece of objective medical evidence to support his decision. Rather, he exclusively relied on the opinions of the consultative physicians who did not examine Moran. Neither non-examining physician was a mental health specialist as was Dr. Durak. Rather, one was a gynecologist and the other an internist. Dr. Lavallo merely filled out a check box form and offered no explanation to support his opinions. It is not clear what medical records Dr. Lavallo based his opinion on, and the ALJ offered no subsequent explanation. Dr. Neville provided some explanation, stating that Moran's functioning appeared better than her WMS-III scores would suggest. He dismissed her WMS-III scores and Dr. Durak's conclusion regarding her memory and concentration deficits by explaining that Moran was able to perform certain daily activities, including cooking simple foods, cleaning, doing laundry, shopping, and driving. However, his opinion was not based on any tests or examinations. Rather, he based his conclusion solely on the activities Moran reported throughout the record, without any inquiry into whether

Moran performed these activities on a sustained basis or any explanation of the pace at which they were performed. Dr. Neville did not explain why he felt that the ability to do certain activities, many of which were necessary and may have been done in spite of pain, was consistent with his finding that Moran had the memory and concentration to sustain gainful employment. Without examining Moran or pointing to one test or personal examination, it appears that Dr. Neville's opinion was based on speculation of the tasks and pace at which Moran could perform.

Moreover, there are inconsistencies within Dr. Neville's conclusion. For example, Dr. Neville's report stated that Moran was limited in her ability to respond appropriately to changes in the workplace, but then stated she was able to adapt to workplace changes. (Tr. 250) He also found that her pace was within normal limits, and then later stated that her pace was slowed and in the psychiatric review, he found that she had problems "maintaining concentration, persistence, or pace." (Tr. 250, 269) The ALJ did not address these inconsistencies within Dr. Neville's own opinions. Dr. Neville drew conclusions, such that Moran could maintain a schedule and engage in tasks for extended periods. However, neither Dr. Neville nor the ALJ provided an explanation or pointed to any tests or examinations to support this conclu-

sion.  This conclusion appears contradictory to Moran's reports
of her ability and the available medical records.  It is not
clear how Dr. Neville could review the records, none of which
were consistent with his conclusion, and reach the determination
that he did.  Additionally, Moran and her son testified that her
condition was worsening.  The ALJ dismissed this on the basis of
insufficient medical records, but he did not consider the reasons
why the record may have been devoid or corroborating evidence.
*Crawford v. Astrue,* 633 F.Supp.2d 618, 632 (N.D. Ill. 2009) (ex-
plaining that the ALJ must consider the claimant's reasons for
failing to seek treatment).  Scott Moran testified that Moran's
condition was increasing in severity, but she did not have the
funds to seek additional treatment.  For these reasons, this
matter is REMANDED to the ALJ to provide greater support for
rejecting the opinions of the examining physicians and for
greater explanation of the inconsistencies within the non-examin-
ing physicians' reports.

Moran next argues that the ALJ failed to investigate how the
VE determined the positions Moran was capable of performing.  The
VE testified that the positions he identified were consistent
with the DOT, except that the DOT did not address limitations
with overhead reaching with the right upper extremity.  The VE
chose the available positions based on his experience to accommo-

date Moran's additional limitation.  Moran argues that the ALJ should have questioned how the VE's experience led him to conclude that Moran could perform the positions he identified.  However, the record is clear that the ALJ fulfilled his duty.

The ALJ is responsible for investigating and resolving any apparent conflicts between the VE's testimony and the DOT.  SSR 00-49; *Weatherbee v. Astrue*, 649 F.3d 565, 570 (7th Cir. 2011).  Provided there is no apparent conflict between the VE's testimony and the DOT, the ALJ may rely on the VE's confirmation that the testimony is consistent with the DOT.  *Weatherbee*, 649 F.3d at 570.  The ALJ also is free to accept the VE's testimony when it conflicts with or exceeds the specifications provided in the DOT.  *See Eaglebarger v. Astrue*, 2012 WL 602022 (*citing Overman v. Astrue*, 546 F.3d 456, 464 (7th Cir. 2008) ("An ALJ is free to accept testimony from a VE that conflicts with the DOT when, for example, the VE's experience and knowledge in a given situation exceeds that of the DOT's authors . . . .")).  Experience, knowledge, education, and training are all sufficient basis on which the ALJ may adopt the VE's opinion that conflicts with or exceeds the purviews of the DOT.  *Eaglebarger*, 2012 WL 602022 at *8.  The  ALJ satisfies his duty when he questions whether the VE's answer is consistent with the DOT and receives an affirmative answer, even if the VE's response partially is based on his

experience, provided there are no apparent inconsistencies that the ALJ must further resolve.  The claimant then has an affirmative duty either to identify any inconsistencies or to question the VE's experience.  If the claimant does not question the VE about the foundation of his opinion, she forfeits the right to challenge it on appeal.  *Eaglebarger*, 2012 WL 602022 at *8 (*citing Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004)).

Here, the ALJ satisfied his duty by questioning whether the VE's testimony was consistent with the DOT, and receiving an affirmative response.  The ALJ elicited testimony from the VE concerning the limitations that were not addressed by the DOT and was permitted to rely on the VE's personal experience for positions that would accommodate Moran's limitations using her right upper extremity.  Moran did not question the basis of the VE's testimony at the hearing and has forfeited her right to do so on appeal.  Nor has Moran pointed to any inconsistencies so apparent that would have triggered the ALJ's duty to delve further into the basis of the VE's testimony.  *See Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009)(explaining that it is harmless error and remand would be futile when no conflict exists between the VE's testimony and the DOT.)  For these reasons, the court finds that the ALJ fulfilled his duty to develop the record on this issue.

Moran however, did identify other testimony that she believed conflicted with the DOT.  First, Moran argues that the usher position did not allow for sitting two hours in an eight hour work day, as it required constant standing to hand out programs and direct people to their seats, and required frequent talking.  Moran also contests that the parking lot attendant position requires frequent reaching, handling, and fingering, which was inconsistent with the ALJ's determination that Moran should be limited to only occasional reaching overhead with the right arm and occasional fingering using the right hand.  Finally, Moran argues that the school bus monitor position required talking, interacting with people, and visual abilities beyond Moran's capabilities.

The Commissioner disputes these inconsistencies.  The DOT description for the usher position did not indicate that the position required constant standing and walking, and even if it included such a requirement, the ALJ determined that Moran was capable of standing six hours during an eight hour work day, which is consistent with the DOT's definition of constant.  Moreover, the ALJ limited Moran to no complex frequent verbal communication.  The DOT description of the usher position stated that the position required simple writing and speaking.  Because the ALJ limited Moran only from frequent complex communications,

Moran was capable of engaging in simple verbal communication. For these reasons, there was no apparent conflict between the usher position and Moran's RFC.

Moran also has challenged whether the school bus monitor position was inconsistent with the RFC because it required talking, interacting with people, and visual abilities beyond her capabilities. Again, there was no inconsistency between the DOT description and her RFC. The school bus monitor position did not require complex verbal communication, and the ALJ did not find that Moran had any visual limitations or limitations interacting with others.

The Commissioner does not dispute that there are inconsistencies between the parking lot attendant position and Moran's RFC. Instead, he argues that any inconsistencies would be harmless error because the usher and school bus monitor positions have not been eliminated and that the ALJ fulfilled his duty because he asked the VE whether the positions were consistent with the DOT. The Commissioner is correct that the ALJ fulfilled his duty by questioning whether the positions were consistent with the DOT. The ALJ was permitted to rely on the VE's confirmation unless the conflict was apparent. Moran has not demonstrated that the conflict was apparent, nor did Moran's attorney question the VE about the conflict at the hearing. *See **Eagle-***

*barger*, 2012 WL 602022 at *7 (explaining that the ALJ can rely on the VE's confirmation that his testimony is consistent with the DOT, and the claimant forfeits the right to challenge this on appeal if she does not question the VE about any non-apparent conflict).

Regardless, the court has not found any inconsistencies between the VE's testimony and the DOT with regard to the usher and school bus monitor positions. Because sufficient positions were available in the economy that Moran was capable of performing based on the RFC as originally assessed, even if the parking lot attendant positions were inconsistent, this would be harmless error. However, the court has instructed the ALJ to reconsider his RFC finding, specifically Moran's limitations with memory and speech. If, after reconsidering the evidence the ALJ re-defines Moran's RFC, he will need to revisit the VE's testimony and determine what positions someone with Moran's limitations is capable of fulfilling.

Moran finally complains that the ALJ ignored the VE's testimony that the school bus monitor positions would be eliminated if the claimant often fell, the parking lot attendant position would be eliminated if the claimant had memory loss and forgetfulness, and the parking lot attendant and usher positions would be eliminated if the claimant struggled with speech.

However, the VE did not find that Moran suffered from these ailments, and therefore, was not required to rely on the VE's testimony that was inconsistent with the stated RFC. Moran's argument is more accurately resolved as a challenge to the RFC. The court already has instructed the ALJ to reconsider the RFC, specifically the records concerning Moran's memory and speech. In doing so, if the ALJ concludes that Moran's memory and speech were more limiting than originally believed, the ALJ will need to readdress the part of the VE's testimony to determine whether someone with Moran's limitations can perform the positions identified by the VE.

_____

Based on the foregoing reasons, the petition for judicial review of the decision of the Commissioner of Social Security filed by Margaret A. Moran on January 18, 2012, is **GRANTED**, and this case is **REMANDED**.

ENTERED this 30th day of January, 2013

s/ ANDREW P. RODOVICH
United States Magistrate Judge